[Civ. No. 15058. First Dist., Div. One. Nov. 16, 1951.]

CHARLES L. HARNEY, INC. (a Corporation), Respondent, v. FRANK B. DURKEE, as Director of Public Works, etc., Appellant.

Robert E. Reed, Holloway Jones, Jack Howard, Norris J. Burke and Lewis L. Fenton for Appellant.

Gardiner Johnson and Thomas E. Stanton, Jr., for Respondent.

PETERS, P. J.—By this proceeding Charles L. Harney, Inc., hereafter referred to as Harney Company, low bidder

on a public improvement under the supervision of the department of public works, seeks to compel the director of that department, by writ of mandate, to award the contract to it after the director had rejected all bids and issued a call for new bids. The trial court determined that the director, in rejecting all bids, had acted arbitrarily and capriciously and had abused the discretion vested in him by law. It ordered the director to award the questioned contract to Harney Company, and enjoined the readvertisement for new bids. The director appeals.

It should be noted that during the periods here involved Charles Purcell was director of public works and Frank B. Durkee was deputy director of the department. Purcell was ill and Durkee was acting as director. Purcell has since died, Durkee has been appointed director, and has been properly substituted as appellant in this case.

The record discloses the following: On March 16, 1951, pursuant to the terms of the State Contract Act (Gov. Code, §§ 14250 to 14424), the state advertised for bids for the construction of a section of the Bayshore Freeway in San Francisco. Prior to publication of this call for bids the state highway department, pursuant to law (Gov. Code, § 14270),[1] had prepared, and the director had approved (Gov. Code, § 14271)[2] plans, specifications and estimates of cost for the project. The approved estimate was in the amount of $1,231,-000. Three competent, reputable and approved construction firms submitted bids. The bids were opened April 11, 1951. It was then discovered that Harney Company, the respondent on this appeal, was the low bidder. Its bid was $1,446,641.45. This is $215,641.45 or 17.47 per cent in excess of the department's estimate of cost.

The contract here involved was a "unit basis" contract. In such cases the director is not prohibited by law from awarding the contract to a bidder whose bid exceeds the estimate.[3] The director is required to "award the contracts to the lowest responsible bidders" (Gov. Code, § 14330) except

[1]The section provides: "Before entering into any contract for a project, the department shall prepare full, complete, and accurate plans and specifications and estimates of cost . . ."

[2]This section provides: "The plans, specifications, and estimates of cost shall be approved by the director and the original draft or a certified copy filed permanently in the office of the department before further action is taken."

[3]Gov. Code, § 14275, provides: "Except in unit basis contracts, contracts shall not be made exceeding in amount the estimates of costs approved by the director . . ."

that, "If the director deems the acceptance of the lowest responsible bid or bids is not for the best interests of the State, he may reject all bids and proceed by day's labor or advertise for other bids. . . ." (Gov. Code, § 14335.)

When the department discovered that the lowest bid exceeded the estimate by 17.47 per cent, the district engineer of the San Francisco office directed his staff to review the situation. Harney Company was directed to present to the engineers all of its work sheets and data upon which its bid was predicated. Checks were made with the other two bidders to make sure that bona fide competitive conditions had prevailed. As a result of these studies, and upon a review of the original estimate, the engineers concluded that their original estimate had been in error in several material respects. These engineers also were of the opinion that Harney Company's bid was fair and reasonable and as low as could be expected. Under date of April 17, 1951, J. H. Skeggs, assistant state highway engineer, by letter, recommended to George T. McCoy, state highway engineer, that the contract be awarded to respondent as the lowest responsible bidder. In this letter Skeggs stated that upon reexamination of the original estimate "it is felt that" the prices of 10 major items and 35 minor items "were estimated too low." The letter points out that costs are increasing and that respondent's bid, in the opinion of the engineers, is "as low as could be expected at this time, or anticipated if the project were re-advertised."

Under date of April 24, 1951, McCoy wrote an interdepartmental communication to the director in which he, too, recommended that Harney Company's bid be accepted. In this communication McCoy stated that the "original estimate was too low and very definitely in error"; that "the original estimate was definitely in error. The low bid is believed to be reasonable, and we feel certain that a lower bid would not be secured through re-advertisement." The letter also called attention to the fact that the appropriate federal agency (federal funds were involved) concurred in the recommendation that the contract be awarded to respondent.

On the morning of April 27, 1951, Durkee, as acting director, rejected all bids and directed that steps be taken to have the work readvertised for new bids. On the afternoon of the same day the state highway engineer presented to Durkee a new or revised estimate of the cost of the project, showing a total estimate $37,479.30 in excess of respondent's

bid. On April 28, 1951, Durkee approved the new estimate and directed that the project be readvertised for new bids.

On May 3, 1951, Harney Company filed this petition for a writ of mandate, requesting that the director be ordered to award the contract to it, and be compelled to discontinue proceedings for the readvertisement for new bids. In the meantime, proceedings for receiving new bids continued and three new sealed bids were received, one from Harney Company, one from one of the other of the original bidders, and one from a new bidder. Before these bids were opened the trial court enjoined further proceedings on such readvertisement until the mandate case could be decided on its merits. Thereafter, a trial was had of the issues presented in the mandate proceeding. After such trial the court entered its judgment directing that the peremptory writ of mandate issue commanding the director to award the contract to respondent. It is from this judgment that this appeal is taken.

The trial court found that Durkee, in rejecting the bids "refused to make any independent determination as to the best interests of the State of California, or to consider and weigh the above-described evidence, facts, reports and recommendations available to him. He concluded that as a matter of law he could not consider or weigh any revised estimates of cost, and could not legally approve the award of the contract to Petitioner, in view of the amount by which Petitioner's bid exceeded the original approved estimates of cost. Therefore, he considered that it was not his duty under the law even to consider and weigh such evidence, facts, reports and recommendations in reaching a determination as to the best interests of the State. Believing this, he failed and refused even to consider said revised estimates or said reports and recommendations." The court also found that the action of Durkee in rejecting all bids "was not for the best interests of the State of California, and was arbitrary, capricious and an abuse of discretion"; that at the time he rejected all bids Durkee "was in possession of facts of his own knowledge, and had available to him information, from which the only reasonable conclusion that could be drawn was that the acceptance of Petitioner's proposal and bid was for the best interests of the State of California." The main question on this appeal is the correctness of these findings in view of the record and the law.

At the inception of these proceedings, by demurrer and other means, the state contended that the trial court had no

power to review the actions of the director; that his actions were executive in nature and not subject to review by the courts, except perhaps for fraud. Admittedly, no fraud on the part of the director was charged or found to exist. After being overruled on these contentions, the state answered contending that there had been no abuse of discretion on the part of the director. In support of this defense Durkee, called as a witness for Harney Company, and as its witness, testified at some length as to the factors that motivated him in rejecting the bids. He testified that he studied the problem as to whether to accept or reject respondent's bid for two days; that he received McCoy's report on the bids and his recommendation to accept the Harney bid; that he knew the amount of the original estimate and that respondent's bid exceeded it by 17.47 per cent; that he knew that his staff admitted that the original estimate was materially in error; that he knew, as was customary, that a revised estimate was being prepared, and knew that it would be substantially higher than the original estimate; that he conferred with one of the engineers and sought and received advice from his attorney; that he was particularly troubled because the low bid was in excess of the original estimate, and because his staff admitted that the original estimate was in error in most material respects; that under such circumstances he determined to reject all bids because: "The statute requires that the estimate be made by the Department before a contract is entered into. We do not estimate our projects after you get the bids; and what the State Highway Engineer was doing in substance, in the communication which he presented to me . . . was making an estimate after the bids were in. We don't do business—that isn't our usual procedure, it isn't the procedure provided for by the Contract Act." He also testified that, in his opinion, "the Director is entitled, in considering any bid on a project such as this—or any other state highway project, or any other work that the Department is doing— he's entitled to a yardstick which is based upon an accurate estimate, so he can tell whether or not the bid ought to be approved. And we didn't have it in this case."

Just before this testimony he had stated: "Well, I had in mind all of the matters that I think the Director should take into consideration: The policy of the law, the whole purpose of the competitive bidding statute, the administration of our Department, the requirement that before contracts are entered into, there shall be full, complete and accurate

estimates, the whole policy of the law with regard to award-ing contracts to bidders.''

He also explained his actions as follows: ''Well, I took into consideration the whole administration of our Depart-ment, the effect upon it of accepting bids and then saying, 'Well, the estimates were wrong,' and making up an estimate after bids came in; the policy of awarding to the low bidder on a job, irrespective of the relationship of his bid to the approved estimate, or any other factors that might be in-volved; the whole policy of competitive bidding as set forth in the Contract Act. In this case the low bid had exceeded the estimate by approximately 17½ per cent, ran over $230,000, which to me was a very important consideration; and the administration of the Department would seem to me to be a very important consideration, the necessity for im-pressing on the engineers that we must have what the law requires in the way of accurate estimates in the beginning, so when the Director has bids before him, he's got some real yardstick to determine whether or not he's getting a fair, reasonable bid under the circumstances.''

On this evidence, the trial court came to the conclusion that Durkee should have accepted the low bid and that in rejecting all bids he acted arbitrarily and capriciously, and abused whatever discretion he may have possessed.

The first contention of the state is that under the statute the director has absolute discretion to reject all bids, and that his actions in this respect are not subject to control by the courts, except, perhaps, for fraud or bad faith. This contention was rejected by the trial court, it holding that, in this respect, the actions of the director were controllable for abuse of discretion. There is language in at least two Cali-fornia cases that seems to support the broad contention made by the state. (*Stanley-Taylor Co.* v. *Supervisors, City & County of San Francisco,* 135 Cal. 486 [67 P. 783], and *Laurent* v. *City & County of San Francisco,* 99 Cal.App.2d 707 [222 P.2d 274].) On the other hand, there is language in *Lands-borough* v. *Kelly,* 1 Cal.2d 739 [37 P.2d 93], which seems in-consistent with the Laurent and Stanley-Taylor Co. cases. The weight of authority elsewhere, where the agency involved has rejected all bids and the lowest bidder seeks to secure the con-tract, seems to be in accord with the contentions of the state, although there are cases to the contrary. (See cases collected, 80 A.L.R. 1382.) We do not find it necessary to decide this point in the instant case because we are of the opinion that,

even if we accept Harney Company's contention that the actions of the director in rejecting all bids are controllable by the courts for an abuse of discretion, the record here demonstrates that there was no abuse of discretion, and that the findings to the contrary are unsupported by any evidence.

The State Contract Act places the control of the construction of public roads costing over $1,000 in the director of public works. (Gov. Code, §§ 14254, 14255.) The balance of the statute contains the provisions requiring competitive bidding. The powers of the director are carefully defined by the statute. Thus, section 14270 of the Government Code provides that: "Before entering into any contract for a project, the department shall prepare full, complete, and accurate plans and specifications and estimates of cost," which the director must approve. (Gov. Code, § 14271.) Except as to unit basis contracts (and this is one), no contract can be awarded if the bid exceeds the estimate. (Gov. Code, § 14275.) The bid must be awarded to the "lowest responsible bidders" (Gov. Code, § 14330), unless "the director deems the acceptance of the lowest responsible bid or bids is not for the best interests of the State," in which event "he may reject all bids and proceed by day's labor or advertise for other bids in the manner required by this chapter." (Gov. Code, § 14335.)

Thus, the statute confers the power to reject all bids if the director deems that such rejection is in the best interests of the state. In the instant case Harney Company seems to contend that the only factor that determines whether rejection or acceptance of the lowest bid is or is not in the best interests of the state is whether or not there is a reasonable likelihood of securing a lower bid on readvertising. It is urged by Harney Company that, in view of the rising costs of road construction, and of the opinion of the engineers that a lower bid was not likely, it has proved that a lower bid is not likely and therefore it has proved that the rejection of its low bid was not in the best interests of the state. But this argument proceeds on a false premise. The reasonable possibility of securing a lower bid, if all original bids are rejected, is not the only factor that may be considered by the director in determining whether acceptance or rejection is in the best interests of the state. The statute prescribes how the director and his department must proceed. Among other things, the department must prepare "full, complete, and accurate" plans and specifications and estimates. There are several

very sound reasons of public policy why such an estimate is required. In the first place, the director, based on the estimate, can determine whether money is available for the project, and, if so, whether the department desires to undertake the project at the estimated cost. In the second place, the amount of the estimate determines the type of advertising that must be employed in connection with calling for bids. (Gov. Code, § 14290 through § 14293.) But there is also an important third reason for requiring such an estimate, and that is to provide the director a yardstick by which to measure the fairness of the bids. The director is not required by law to be an engineer. When he knows that a fair and accurate estimate has been prepared by the engineers of his staff before submitting the project to bids, he can then determine whether the bid is or is not fair in comparison with that estimate. But when he has no estimate at all, or has an estimate that is admittedly erroneous in major respects, or has an estimate that has been prepared after the bids have been submitted and after his engineers have consulted the work sheets of the bidder, the director has been deprived of the very yardstick given him by law and intended to protect him and the public.

In the instant case the director knew that the lowest bid exceeded the estimate by 17.47 per cent—some $215,000 in excess of the estimate. If the director had had the yardstick given him by law—a full, complete and accurate estimate— and that estimate showed that the lowest bid exceeded the estimate by 17.47 per cent, there can be no doubt at all that the director, acting well within his conferred discretion, could reject all bids for that reason alone. But here he had been informed that his yardstick was inaccurate and that his engineers had admitted that the original estimate was in error in very material respects. It was the same as if no estimate at all had been prepared, because an erroneous estimate cannot and should not be used to measure the fairness of a bid. Certainly, if no estimate at all had been prepared, the director could and should, for that reason alone, reject all bids. In fact, in such event, any contract he might award to the lowest bidder would be subject to attack and would probably be held to be invalid. In *Atkinson* v. *State Dept. of Engineering,* 165 Cal. 699, 706 [133 P. 616], the court stated, referring to a statute substantially similar to section 14270 of the Government Code: ''Clearly, under the act an estimate of cost was required as to such matters, and if no estimate had been made

in regard thereto, the department of engineering was not warranted in proceeding in the matter of letting a contract for the work." (See, also, *Board of Com'rs of Wyandotte County* v. *Davis*, 92 Kan. 672 [141 P. 555, L.R.A. 1915A 198].) This conclusion follows from the well-settled rule that: "Ordinarily, compliance with the terms of a statute requiring the letting of certain contracts by a public agency such as a municipal corporation or county by competitive bidding and the advertising for bids is mandatory with respect to those contracts coming within the terms of the statute; a contract made without compliance with the statute is void and unenforceable as being in excess of the agency's power." (*Miller* v. *McKinnon*, 20 Cal.2d 83, 87 [124 P.2d 34, 140 A.L.R. 570] ; see, also, *Los Angeles Dredging Co.* v. *Long Beach*, 210 Cal. 348 [291 P. 839, 71 A.L.R. 161].)

Durkee here testified that one of the major factors that motivated him in rejecting all bids was that he knew that the statute required that a "full, complete, and accurate" estimate was a condition precedent to awarding a valid contract, and he knew that the original estimate was not "accurate" because his staff had told him that it was materially and basically in error. Because of these errors Durkee was not only deprived of the yardstick given to him by law—i. e., an "accurate" estimate—a yardstick provided for his benefit and for the protection of the public—but he had grave doubts as to the legal validity of any contract he might enter into based upon an erroneous and invalid estimate. He knew that any taxpayer could attack the validity of such a contract and that, in such event, grave delays might ensue. After consultation with his attorney, he had to make his decision. He determined that it was not for the best interests of the state to enter into a contract of such doubtful validity. This legal question is certainly at least a debatable one. His determination, honestly arrived at, is binding on all bidders.

But, says Harney Company, Durkee knew that a revised or new estimate was being drafted, and knew or should have known that such revised or new estimate would be in excess of Harney Company's bid, and he should have considered this new and revised bid in determining what the best interests of the state might be. The trial court found that Durkee did not consider this new estimate in rejecting all bids, and its judgment is basically predicated on the theory that such failure was arbitrary, capricious and an abuse of discretion.

We agree with Harney Company that Durkee knew or

should have known that a revised or new estimate was being prepared. He knew this from McCoy's letter and from his knowledge of the practice of the department. Moreover, as head of the department, he is chargeable with knowledge of what his subordinates were doing and had done. It must be accepted as a fact, therefore, that Durkee knew or should have known of the preparation of the revised or new estimate. But his failure to wait for the new estimate or to consider it does not prove an abuse of discretion. This is so because he also knew some other facts. He knew that the revised or new estimate was being prepared not only to permit the engineers to check respondent's bid and their estimate, but also as a basis for readvertising for bids if he should reject all bids. He also knew that the new estimate was not prepared until after the bids were opened and until after the engineers had discovered that the lowest bid exceeded their estimate by 17.47 per cent. He also knew that, upon ascertaining that fact, the engineers had requested Harney Company to bring to them its work sheets and other data upon which its bid had been predicated, and that such work sheets and data had been examined and studied by his engineering staff—all prior to the preparation of the new estimate. He also knew that the other two bidders had been consulted, and their bids discussed.

Under such circumstances Durkee was certainly justified in believing, reasonably, that a new estimate prepared under these circumstances, was not the estimate provided for by law. As already pointed out, one of the purposes of requiring an estimate is to protect the public and the director, and to give him an objective and accurate yardstick to measure the fairness of the bid. The law does not contemplate that estimates shall be prepared after examining the bids and the bidders' work sheets. Such an estimate would be valueless and such a practice would lend itself to the very abuses that the statute, by requiring prior estimates, was intended to prevent. Durkee considered these matters. He had grave and reasonable and sound doubts as to whether a new estimate so prepared would constitute substantial compliance with the provisions of the statute.

Thus, the legal and factual situation is one where Durkee knew that the original estimate was substantially in error, and for that reason he doubted, reasonably, whether such erroneous estimate could serve as a basis for awarding a valid contract to Harney Company. So far as the new estimate is concerned, he doubted, with good reason, whether

he could consider such estimate under the law. Under such circumstances, even if new bids might be in excess of the old ones, Durkee acted well within the discretion conferred upon him by law in rejecting all bids, and the findings to the contrary are unsupported.

Harney Company also points out that all of Durkee's subordinates in the department, all of whom were engineers, recommended the acceptance of Harney Company's bid. It is argued that he should have followed their recommendations since he is not an engineer. The statute confers the discretion involved on the director, not upon his subordinates. Certainly, the director is not compelled to follow the recommendations of his subordinates. In fact, the ''accurate'' estimate provision of the statute was passed to give the director a check on his subordinates. While their recommendations are a factor that Durkee should and did consider they were not binding upon him.

This conclusion may seem a harsh one so far as Harney Company is concerned. Admittedly, its bid was honestly and fairly prepared. ▮ But competitive bidding statutes are not passed for the benefit of bidders but for the benefit and protection of the public. No right exists in the lowest bidder to have his bid accepted where the statute confers the power to reject all bids. While it is unfortunate that all bids were rejected because the department engineers made mistakes in the original estimate, public policy requires that the director have this power and protection or grave abuses may arise.

An appeal has also been taken from a special order after final judgment directing that the appeal should not operate as a stay of execution. In view of the reversal of the main judgment, this order, too, should be reversed.

The judgment and the order appealed from are reversed.

Bray, J., and Wood (Fred B.), J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied January 15, 1952. Schauer, J., voted for a hearing.