[No. A084042. First Dist., Div. Two. May 28, 1999.]

TRANSDYN/CRESCI JV, Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al., Defendants and
Respondents.

**COUNSEL**

Sonnenschein Nath & Rosenthal, Oliver L. Holmes, Mark J. Linderman and Thomas M. Hanson for Plaintiff and Appellant.

Louise H. Renne, City Attorney, George K. Wong and Sheryl L. Bregman, Deputy City Attorneys, for Defendants and Respondents.

**OPINION**

**RUVOLO, J.—**

## I.

### INTRODUCTION

Appellant Transdyn/Cresci, JV appeals from the trial court's denial of its petition for writ of mandamus seeking to compel respondent Public Utilities Commission of the City and County of San Francisco (the Commission) to issue appellant a contract to monitor the quality and flow of San Francisco's water supply. Appellant contends the Commission violated the provisions of the San Francisco Administrative Code when it passed a resolution rescinding the Commission's earlier contract award to appellant.

We agree and reverse. The action of the General Manager of the Public Utilities Department of the City and County of San Francisco (Department Head) in refusing to sign the contract after the Commission had passed an original resolution awarding the contract to appellant pursuant to competitive bidding laws exceeded the scope of the Department Head's legal authority, as did the refusal to forward the contract to the Controller of the City and County of San Francisco (Controller) for certification that sufficient funds were available to finance the project. Therefore, the subsequent resolution of the Commission rescinding the contract award to appellant and purporting to reject all bids was unlawful.

We direct the trial court to issue a writ of mandate compelling the Department Head and the Controller to perform the acts necessary to implement the original resolution awarding the contract to appellant, and declaring the Commission's resolution rescinding the award null and void.[1]

## II.

### BACKGROUND

On January 27, 1998, the Commission authorized the issuance of an "Invitation for Proposals" (IFP) for contract WD-2223. Contract WD-2223 involves the design, manufacture, and installation of the "San Francisco Water Supervisory Control And Data Acquisition (SCADA) system." The City and County of San Francisco (the City) has been ordered by the California Department of Health Services to complete the SCADA system no later than March 2000. If the City fails to meet this deadline, it could face fines of up to $500 per day.

On March 26, 1998, the Public Utilities Department of the City and County of San Francisco (Department) received five sealed bids.[2] The lowest bid was rejected because the bid bond was improper. The second lowest bid was rejected because it failed to comply with the City's "Minority Business Enterprise" (MBE) subcontracting participation requirements. Appellant submitted the third lowest bid.

On April 28, 1998, the Commission conducted a regular meeting. Agenda item 24 (item 24) consisted of the Department's recommendation that the Commission find that appellant was the lowest responsible bidder, and award contract WD-2223 to appellant. The Department Head signed this agenda item in a section entitled "approvals."

The Commission adopted the Department's item 24 recommendation, and passed the following resolution: "RESOLVED, That this Commission hereby awards San Francisco Water Department Contract WD-2223, San Francisco Water Supervisory Control And Data Acquisition (SCADA) system, in the amount of $10,542,055 to the lowest responsive bidder, [appellant]."

---

[1]Because we have concluded that the trial court should have granted the writ of mandate to compel the Department Head and the Controller to complete their ministerial duties, we need not reach appellant's alternative argument that the Department Head's decision to refuse to execute contract WD-2223 was not supported by substantial evidence.

[2]The names of the bidders and the bid amounts were: (1) Troy's Contracting/Edward W. Scott Electric Co., Inc., a joint venture—$9,530,010; (2) SWK, a joint venture—$10,321,165; (3) Transdyn/Cresci JV, a joint venture—$10,966,927; (4) Amelco Electric—$12,437,200; and (5) System Analysis & Integration—$16,776,033. The Commission's engineer estimated that the project would cost $10.9 million.

The Commission notified appellant that it had been awarded contract WD-2223 by letter dated May 4, 1998. Appellant was instructed to execute and return the enclosed agreement, labor and material/performance bonds, and certificate of insurance within 10 days from receipt of the May 4 letter. Appellant forwarded these materials to the Commission on May 12, 1998.

On May 12, 1998, the Commission learned that the attorney representing the second lowest bidder was threatening to file a lawsuit challenging the City's MBE subcontractor participation requirements. Several days later, the Commission was informed that these threats had been made without the knowledge or consent of the second lowest bidder, and that no such suit would be filed. Shortly thereafter, the second lowest bidder's subcontractor, HSQ Technology (HSQ), threatened litigation. HSQ contended that the minority participation goal of 22 percent could not be justified, and that the goal should have been set at a lower level.

The Department Head consulted with the San Francisco City Attorney regarding the risk that HSQ would file litigation regarding the MBE goal for contract WD-2223. He also reviewed the bids, and determined that "the difference between the second low bid and [appellant's] bid was approximately $600,000 . . . ." He concluded, "If the minority participation goals had been set too high and the second low bidder might have been entitled to award, with a potential savings of $600,000 for the City, then the proper and equitable action for the Department to take would be to reject all bids and rebid the contract." Accordingly, the Department Head refused to sign the contract with appellant. Because the contract was never executed, it was not forwarded to the Controller for certification.

On June 23, 1998, the Commission met and considered various matters, including the Department's agenda item 18. Item 18 stated, "On April 28, 1998, . . . the Commission awarded the contract to [appellant]. [¶] Prior to contract execution, the [Commission], in consultation with the City Attorney, has determined that it is in the City's best interest to rescind the earlier award, and reject all bids received." It recommended "Rescinding the award of . . . Contract WD-2223, . . . made to [appellant], and rejecting all bids received on March 26, 1998." The Commission adopted this recommendation and passed a resolution providing ". . . That this Commission hereby rescinds the award of Contract WD-2223, San Francisco Water SCADA System, made on April 28, 1998 by Resolution No. 98-0095 to [appellant], and rejects all bids received."

On June 24, 1998, appellant filed this petition for writ of mandate. The trial court issued an alternative writ and granted appellant's request for a

stay pending the outcome of the petition. The court immediately stayed "[a]ny action pursuant to the rescission of the award of PUC Contract No. WD-2223" and "[t]he rebid of the Contract," and ordered that "[n]either the [City] nor the [Commission] shall undertake any action in connection with the rescission of the award of the Contract or the rebid of the Contract pending final disposition of this Petition." However, the court permitted "internal rebid preparation" to go forward.

On August 6, 1998, the trial court denied appellant's petition for writ of mandate. The court concluded appellant had never been awarded the contract, explaining "although the City took clear steps toward award of the Contract to [appellant], the award was never perfected." The court reasoned that under section 6.05 of the San Francisco Administrative Code, and section 3.105 of the San Francisco Charter, the contract required the Department Head's signature and the Controller's certification of the availability of funds. After observing that "[h]ere, the Department [Head] did not sign Contract No. WD-2223 and the Controller did not certify the availability of funds for the contract," the court concluded "[w]ithout these statutorily-prescribed elements of award, there was no contract."

The trial court also held that appellant was not entitled to a writ of mandate because the Department Head's duty to sign the contract was discretionary, not ministerial. The court reasoned "Under section 6.05 of the City's Administrative Code, the 'letting' of a contract is a discretionary act imparted to a high ranking public official and is critical to the statutory prescription for award. The Department [Head] here had the discretion and, indeed, the responsibility not to sign the contract where he believed that entering the contract would not be in the best interests of the City."

This timely appeal followed. On August 10, 1998, appellant requested that the trial court grant an immediate stay of the August 6, 1998, order pending appeal. The court granted appellant's request, and continued the June 24, 1998, stay pending disposition of this appeal. On January 4, 1999, we granted the parties' joint motion to provide calendar preference for this appeal.[3]

---

[3]On December 23, 1998, appellant requested that the court take judicial notice of the Commission's published agendas and minutes for the Commission's meetings held on October 27, 1998, and November 10, 1998. These agendas and minutes were not before the trial court and contain no information pertaining to appellant or contract WD-2223. Accordingly, the request for judicial notice is denied.

### III.

### DISCUSSION

#### A. Standard of Review

■ A writ of mandate "may be issued by any court, . . . to compel the performance of an act which the law specially enjoins, as a duty resulting from an office, trust, or station, . . ." (Code Civ. Proc., § 1085, subd. (a).) To warrant such relief, the petitioner must demonstrate there is no other plain, speedy and adequate remedy, the public official or entity had a ministerial duty to perform, and the petitioner had a clear and beneficial right to performance. (*Pomona Police Officers' Assn.* v. *City of Pomona* (1997) 58 Cal.App.4th 578, 584 [68 Cal.Rptr.2d 205].)

"Generally, Code of Civil Procedure section 1085 may only be employed to compel the performance of a duty which is purely ministerial in character. [Citation.] [¶] A ministerial act is an act that a public officer is required to perform in a prescribed manner in obedience to the mandate of legal authority and without regard to his own judgment or opinion concerning such act's propriety or impropriety, when a given state of facts exists. Discretion, on the other hand, is the power conferred on public functionaries to act officially according to the dictates of their own judgment. [Citation.]" (*Rodriguez* v. *Solis* (1991) 1 Cal.App.4th 495, 501-502 [2 Cal.Rptr.2d 50].)

In this case, the interrelated questions of whether the award process was complete once the Commission passed its resolution approving appellant's bid, and whether the Department Head's duty to sign the contract was ministerial or discretionary turn on the proper interpretation of section 6.05 of the San Francisco Administrative Code.[4] Similarly, the appropriate characterization of the Controller's duty to certify the availability of funds depends on our construction of section 3.105 of the San Francisco Charter. Thus, we review de novo these issues of statutory construction. (*United Assn. of Journeymen* v. *City and County of San Francisco* (1995) 32 Cal.App.4th 751, 759, fn. 6 [38 Cal.Rptr.2d 280].)

Mandamus relief is also available to "correct those acts and decisions of administrative agencies which are in violation of law . . . ." (*Bodinson Mfg. Co.* v. *California E. Com.* (1941) 17 Cal.2d 321, 329 [109 P.2d 935].) The legality of the Commission's decision to rescind the contract is also subject to de novo review because it involves a question of law.

---

[4] All further undesignated statutory references are to the San Francisco Administrative Code.

### B. *Character of Department Head's Duty to Sign Public Contracts*

In San Francisco, a contract for public work in excess of $50,000 must be "let" to the "lowest reliable and responsible bidder" in accordance with competitive bidding principles. (§ 6.05.) The San Francisco Administrative Code sets forth two different procedures, depending on whether the contracting party is a department "under the Mayor."

In this regard, section 6.05 provides in relevant part: "When the expenditure for any public work or improvement shall exceed the sum of $50,000, the same shall be done by contract, except as otherwise provided in the Charter or the Administrative Code. The head of the department in charge of or responsible for the work for which a contract is to be let, or the purchaser of supplies in the case of purchases of materials, supplies and equipment, shall let such contract to the lowest reliable and responsible bidder not less than 10 days after advertising by publication for sealed proposals for the work, improvement or purchase contemplated. . . .

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

". . . If such contract is for any public work or improvement, it shall require the joint approval of the department head and the Mayor or the Mayor's designee for amounts in excess of $50,000 *relative to departments under his or her jurisdiction, or the signature of the department head and the approval by resolution of the board or commission concerned for departments not under the Mayor.* . . ." (Italics added.) It is undisputed that the Commission is an agency "not under the Mayor."

■ Here, a proposed resolution was submitted to the Commission recommending that it accept appellant's bid and award contract WD-2223 to appellant. This proposal was signed and approved by the Department Head. The Commission passed the resolution, and informed appellant that it had been awarded the contract. However, the Department Head subsequently refused to sign the contract, the Commission revoked the award, and the contract was never forwarded to the Controller for certification. Under these circumstances, we reject the trial court's conclusions that mandamus relief was not proper.

In reaching this determination, we are assisted by two factually similar cases in which our Supreme Court concluded that a competitively bid contract for public work is awarded at the time the public entity accepts the bid, and that a public official's duty to execute such a contract is ministerial. (*City of Susanville* v. *Lee C. Hess Co.* (1955) 45 Cal.2d 684, 694-695 [290

P.2d 520] (*City of Susanville*); *Williams* v. *City of Stockton* (1925) 195 Cal. 743, 747 [235 P. 986] (*Williams*).)

In *City of Susanville, supra,* 45 Cal.2d at page 688, the city solicited competitive bids for a public works contract. After receiving the bids, the city council (council) passed a resolution declaring Lee C. Hess Company (Hess) to be the lowest responsible bidder, and awarding the contract to Hess. (*Ibid.*) The applicable statute required the execution of a formal written contract once the council awarded the contract to the successful bidder. (*Id.* at p. 694.) However, four days later, the council received erroneous information that Hess was not a properly licensed contractor. In response, it held a special meeting and passed a resolution declaring Hess ineligible to bid on the work and awarding the contract to Katsaros, the next lowest bidder. (*Id.* at p. 688.) Before executing the contract with Katsaros, the city filed an action for declaratory relief to determine the validity of its proceedings regarding the contract. (*Ibid.*)

The Supreme Court held that the resolution awarding the contract to Hess was valid, and the subsequent resolution rescinding the award was null and void. (*City of Susanville, supra,* 45 Cal.2d at p. 696.) The court concluded that when competitive bids are solicited for public works, an enforceable contract is formed at the time the contract is awarded to the lowest responsible bidder, rather than at the time the contract is executed by the public entity. (*Id.* at p. 694.) The court went on to explain " 'It has long been decided in this and other states and in the courts of the United States that in the letting of contracts for the doing of public works where the legislative body or the administrative officer is required by statute to call for bids and must under competitive bidding conditions let the contract to the lowest responsible bidder, *the making of the award gives rise to a contract between the public body or agent and the successful bidder. . . .*' [Citations.] In 10 McQuillin on Municipal Corporations, third edition (1950), section 29.71, page 343, the rule is accurately stated, thus: 'While it is true that a municipal corporation has discretion as to the time and manner of making corporate improvements and the purchase of supplies, still *when this discretion has been exercised and a contract made relative thereto, the legislative function has been exhausted, and the duty has become purely ministerial, and a contract so made cannot be impaired at the option of the municipality. Hence, when a bid has been accepted by the proper authorities, such acceptance cannot be revoked.*' " (*Id.* at pp. 694-695, italics added.)

Accordingly, the court concluded " 'Applying the foregoing, we hold that the Hess Company's bid had been accepted and the contract awarded to it by

regular action of the city council in strict pursuance of the statutory scheme. *All the essentials of contract were present and Hess Company was entitled as of right to have the further proceedings take their statutory way. The city was without power, in the absence of fraud, mutual mistake or some other ground of recission, none of which is claimed to have existed, to rescind its action and to take the contract from Hess Company and award it to Katsaros.'* " (45 Cal.2d at p. 695, italics added.) The court declared " 'The proceedings were valid to the point to which they had been taken when the award was made to the Hess Company and were invalid beyond that point.' "[5] (*Id.* at p. 696.)

This distinction between a municipality's preaward and postaward authority was also emphasized in *Williams, supra,* 195 Cal. at page 747. In *Williams,* the relevant city charter provided that all city contracts "should be drawn under the supervision of the city attorney and that they 'must be in writing, executed in the name of the city of Stockton by an officer or officers authorized to sign the same.' " After soliciting bids to construct a new city hall, the city council adopted a resolution awarding the contract to Williams, and authorizing the mayor to execute the contract in the name of the City of Stockton. However, the mayor refused to execute the contract.

When a new city council and mayor took office, they adopted a resolution rescinding the award to Williams, and rejecting the previously solicited bids. (195 Cal. at p. 752.) The new administration also amended the charter to provide that " 'All contracts shall be signed on behalf of the city by the mayor and attested by the city clerk.' " (*Ibid.*) After the new mayor refused to comply with Williams's demands to execute the contract, Williams filed a petition for writ of mandate.

Our Supreme Court held that Williams was entitled to a writ of mandate compelling the mayor to sign the contract. It concluded that the following rule applied: " '*When an award has once been made the public body has no discretion but to execute the contract. The rights of the parties then become fixed, and the power to cancel the award or reject the bids does not exist. The obligation of the contract made cannot thus be impaired at the option of one of the contracting parties.*' " (195 Cal. at p. 751, italics added.)

As to the question of the mayor's right to withhold signature, the court stated: "[W]hen he, as an officer of the city, was authorized and

---

[5]The court did not mandate that the public officials enter into the formal contract with Hess and permit it to perform the work, because of the limited nature of the relief sought by the City in its declaratory action to " 'set at rest all questions concerning the legality of what has been done . . . .' " (45 Cal.2d at p. 696.) As the court explained, " 'We cannot assume that if . . . these proceedings are declared to be valid and the contract declared to have been awarded to [Hess], there will be any refusal to perform ministerial acts arising because of that situation.' " (*Ibid.*)

directed by the duly adopted resolution of the council to sign the same, it became his duty to do so as a duty resulting from his office. *The mayor's duty to sign the contract was ministerial only, and involved the exercise of no discretionary power* [citation]." (195 Cal. at pp. 748-749.)

Respondent contends, however, that *City of Susanville* and *Williams* are distinguishable primarily because in this case the requirement that the Department Head affix his signature to the contract is "inextricably linked by statute to the award process."[6] Respondent argues that because section 6.05 delegates the responsibility to "let" contracts to the Department Head, the Department Head retains the authority to veto awards approved by the Commission by withholding his signature. We disagree.[7]

Although section 6.05 instructs department heads to "let [contracts for public works in excess of $50,000] to the lowest reliable and responsible bidder not less than 10 days after advertising by publication for sealed proposals for the work, improvement or purchase contemplated," we cannot agree that this language, particularly when read in context with the balance of section 6.05, provides department heads with the final authority to select the successful bidder for the work of agencies not under the mayor.[8]

---

[6]Respondent also urges us to disregard *City of Susanville* because the court did not grant appellant mandamus relief. However, the court's determinations that the municipality's duties after awarding the contract to Hess were solely ministerial, and that the subsequent award to Katsaros was invalid cannot be dismissed so lightly. In *City of Susanville*, the court did not grant appellant mandamus relief because it was neither requested nor necessary. It was the city that had initiated the underlying action for declaratory relief, and the court explained that it had no reason to assume " 'there will be any refusal to perform ministerial acts arising because of that situation.' " (*City of Susanville, supra,* 45 Cal.2d at p. 696.)

[7]In their brief, respondents have called our attention to a series of cases in which various courts have held that the courts should not interfere with a public entity's legislative authority to either award a contract to a bidder or reject all bids. (*Mike Moore's 24-Hour Towing* v. *City of San Diego* (1996) 45 Cal.App.4th 1294, 1303 [53 Cal.Rptr.2d 355] ["[a] public entity's 'award of a contract, and all of the acts leading up to the award, are legislative in character' "]; *Stanley-Taylor Co.* v. *Supervisors* (1902) 135 Cal. 486 [67 P. 783] [court refused to compel board of supervisors to award contract to low bidder instead of rejecting all bids]; *Charles L. Harney, Inc.* v. *Durkee* (1951) 107 Cal.App.2d 570 [237 P.2d 561, 31 A.L.R.2d 457] [court refused to compel director of public works to award contract instead of rejecting all bids]; *Judson Pacific-Murphy Corp.* v. *Durkee* (1956) 144 Cal.App.2d 377 [301 P.2d 97] [court refused to compel public entity to award of public works contract to a particular bidder].) These cases are distinguishable, however, because they do not involve the public entity's postaward obligations.

[8]To the extent respondents argue that the provisions of the San Francisco Charter and the San Francisco Administrative Code defining the authority of the Commission, the Department, and the Department Head support their position, this argument is not persuasive. Section 4.112 of the San Francisco Charter defines the authority of the Commission as follows: "The Commission shall have charge of the construction, management, supervision,

As we have pointed out, Section 6.05 comprehensively sets forth the specific mechanics of the award process several paragraphs later. There, the code section plainly sets forth two different procedures—one for departments under the mayor, and one for boards or commissions acting for departments not under the mayor. Departments under the mayor must obtain "joint approval" of the contract by the department head and the mayor or his or her designee. In these instances, the lawmakers have provided department heads with the discretionary ability to effectively veto a contract that has been approved by the mayor by withholding their "joint approval."

However, where the relevant department is not under the mayor, section 6.05 only requires "approval" of the contract by resolution from the relevant board or commission, and the "signature" of the department head. Use of the word "signature" instead of "approval" suggests there was no intention to permit department heads to veto contracts for public works once the board or commission has approved them. Therefore, we conclude that the general language in section 6.05, instructing department heads to "let" contracts for public works in excess of $50,000 to the "lowest reliable and responsible bidder" merely instructs department heads to ensure such contracts are awarded through the competitive bidding process. It does not provide department heads with authority over the discretionary process of determining which of the bidders will be awarded contracts for agencies "not under the Mayor."

Moreover, if the intention was to require the department head's approval on all contracts, there would have been no need to outline a separate procedure for departments not under the mayor. Section 6.05 would simply have required "joint approval by the department head and the board or commission concerned for departments not under the Mayor." Thus, we must assume that the word "signature" was intended to mean something other than "approval." (See *Campbell* v. *Zolin* (1995) 33 Cal.App.4th 489, 497 [39 Cal.Rptr.2d 348] [where Legislature uses different words in different parts of a statute, courts must presume Legislature intended a different

maintenance, extension, operation, use and control of all water and energy supplies and utilities of the City as well as the real, personal and financial assets, which are under the Commission's jurisdiction . . . ." The Department is charged with "locat[ing] and determin-[ing] the character and type of all construction and additions, betterments and extensions to utilities under its control, and shall determine the policy for such construction or the making of such additions, betterments and extensions from the public funds under its jurisdiction; . . ." (*Ibid.*) The Department Head is "immediately responsible for the administration of his or her department, . . ." (§ 2A.30.) Thus, although the Department Head is responsible for administrative matters, it is the Commission that has "charge of the construction, management, supervision, maintenance, extension, operation, use and control of all water and energy supplies and utilities of the City." (S.F. Charter, § 4.112.)

meaning].) When we interpret the word "signature" in accordance with its usual and ordinary meaning, it is clear that it refers to the simple act of executing the contract.

Accordingly, this case falls squarely under the binding precedent set forth by our Supreme Court in *City of Susanville* and *Williams*. The City exercised its discretionary, executive function when the Commission approved appellant's bid and awarded the contract to appellant by resolution. Once the contract was awarded, the City was not free to revoke the contract absent legal grounds for recission.[9] (*City of Susanville, supra*, 45 Cal.2d at p. 696; *Williams, supra*, 195 Cal. at p. 751.) At that point in time the executive function was exhausted, and the Department Head's duty to sign the contract became ministerial. (*City of Susanville, supra*, 45 Cal.2d at pp. 695-696; *Williams, supra*, 195 Cal. at pp. 748-749, 751.) Therefore, appellant was entitled "as of right to have the further proceedings take their statutory way." (*City of Susanville, supra*, 45 Cal.2d at p. 695.) Accordingly, the trial court was required to grant appellant's petition for a writ of mandate compelling the Department Head to sign contract WD-2223, and declaring the Commission's June 23, 1998, resolution rescinding the contractual award null and void.

### C. *The Character of the Controller's Duty to Certify the Availability of Funds*

Appellant also requested a writ of mandate compelling the Controller to certify whether sufficient funds were available for the project.

Below, respondents conceded that they were not contending "there was not sufficient money in the San Francisco till to cover [the contract]." They also acknowledged that the Controller's discretion is limited to the ministerial duty of ascertaining "whether there is the availability of funds for this contract."

In its opinion, the trial court noted that appellant sought to compel certification by the Controller, but stated "On the question of discretionary acts in this matter, the Court is primarily concerned with the discretion of the Department [head]." Nevertheless, the court denied appellant's petition, in part, based on its conclusion that no contract existed without the Controller's certification. Accordingly, we will briefly address whether the City's failure

---

[9]Respondents do not contend that the Department Head's desire to avoid litigation and to obtain a lower bid on the contract constituted lawful grounds for rescinding the contract with appellant.

to refer this contract to the Controller for certification invalidated the City's contract with appellant, and whether the Controller's certification duty is also ministerial in nature.

Under section 3.105 of the San Francisco Charter, "[a]ll disbursements of funds in the custody of the Treasurer must be authorized by the Controller," and the City is not bound by a written contract "unless the Controller shall certify that sufficient unencumbered balances are available in the proper fund to meet the payments under such contract . . . ." Nothing in the charter suggests that the City may nullify an otherwise valid contract by failing to refer the contract to the Controller for certification.

In *Flora Crane Service, Inc.* v. *Ross* (1964) 61 Cal.2d 199, 208 [37 Cal.Rptr. 425, 390 P.2d 193] (*Flora Crane*) our Supreme Court concluded that the award of a contract for public work includes "an implied covenant by the city to take whatever steps were required to 'carry it into effect,' and in particular a covenant to submit the matter to the controller for [certification]." Where a city fails to refer a contract to its controller for certification, it may not "profit by its own inaction" by invalidating an otherwise binding contract. (*Id.* at p. 207.)

Moreover, the *Flora Crane* court concluded that the controller is under a clear ministerial duty to make such a certification. (*Flora Crane, supra,* 61 Cal.2d at p. 201.) The court explained that under the San Francisco Charter, "the controller is required only to determine *as a matter of fact* whether 'there is' such an appropriation and whether such funds 'are available' in the treasury. A determination of this nature 'is a matter of mere calculation requiring no exercise of discretion' [citation]. ▮ As summarized in 15 McQuillin on Municipal Corporations (3d ed. 1950) at page 115, 'The officer [here, the controller] certifies to the fact respecting the sufficiency of available funds as it exists when the certificate is made. The duty to certify, being expressly imposed by law, is ministerial and may be compelled by mandamus.' " (61 Cal.2d at p. 204.) Accordingly, the trial court erred when it denied appellant's petition for a writ of mandate to compel the Controller to complete the certification process.

## IV.

### DISPOSITION

The judgment of the trial court is reversed. The court is directed to enter an order granting the petition for writ of mandate, declaring the June 23, 1998, resolution invalidating the contract to be null and void, reinstating the

April 28, 1998, resolution awarding contract WD-2223 to appellant, compelling the General Manager of the Public Utilities Department for the City and County of San Francisco to execute contract WD-2223, and compelling the Controller to certify whether sufficient funds are available to finance the contract.

Haerle, Acting P. J., and Lambden, J., concurred.